## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

James C. Krutchen,                              Civil No. 08-4737 (DWF/FLN)

        Plaintiff,

v.                                              **MEMORANDUM**
                                                **OPINION AND ORDER**

Zayo Bandwidth Northeast, LLC;
Onvoy, Inc., d/b/a Onvoy Voice Services;
and Zayo Group Inc.,

        Defendants.

_____

John D. Thompson, Esq., and Natalie Wyatt-Brown, Esq., Oberman Thompson & Segal, LLC, counsel for Plaintiff.

Katherine C. Bischoff, Esq., and Thomas E. Marshall, Esq., Jackson Lewis LLP, counsel for Defendants.

_____

## INTRODUCTION

This matter is before the Court on a Motion to Dismiss and Transfer brought by Defendants Zayo Bandwidth Northeast, LLC ("Zayo Bandwidth"), Onvoy, Inc. ("Onvoy"), and Zayo Group Inc. ("Zayo Group," and together "Defendants"). Plaintiff James C. Krutchen ("Krutchen") opposes the motion. For the reasons set forth below, the Court grants in part and denies in part the Defendants' motion.

## BACKGROUND

Krutchen is an engineer who works in the telecommunications field. In July 1998, Krutchen began working in Minnesota for MEANS Telecom, which became Onvoy in

April 1999.  While Krutchen was employed by Onvoy in Minnesota, he became aware of a scheme by which Onvoy routed telephone traffic for MCI Communications Corporation ("MCI") to avoid the payment of access charges.[1]  The project was called "Canadian Gateway."  (Doc. No. 6 ¶ 14.)

First, Onvoy routed the calls to a Canadian carrier.  The Canadian carrier then routed the traffic to Bell Canada, which was connected by a fixed-rate, unmetered line to the network operated by AT&T.  AT&T brought this telephone traffic back into the United States, bearing the cost of transport and paying the access charges for terminating the calls through local telephone companies.

The purpose of this scheme was to deceive AT&T into handling MCI-originated long distance traffic and for AT&T to pay the terminating access charges for MCI's calls. In furtherance of this scheme, Onvoy altered the telephone traffic's identifying information to erase any indication that the calls originated with MCI.  Krutchen believed and confirmed that this scheme originated with MCI.[2]

---

[1]     According to Krutchen's Amended Complaint, at this time long distance carriers were charged fees for access to the wires, facilities, and equipment used to receive and deliver long distance telephone traffic to local telephone customers.

[2]     Krutchen had previously worked for MCI and during that time became aware of an MCI scheme called "Project Invader."  The purpose of Project Invader was to route long distance calls to independent telephone companies that normally carried only local traffic, for which no access charges were collected.  MCI thereby sought to avoid paying access fees for completing long distance calls.  MCI altered the traffic's identifying information so that it would appear that the traffic originated locally.  MCI also paid the independent telephone companies a small fee for participating in the scheme.

Onvoy also engaged in a similar scheme to divert through Canada long distance telephone traffic originating from sixty rural Minnesota telephone companies.[3]  Onvoy acted as the long distance carrier for these companies, delivering the traffic to a Canadian carrier that handed the traffic off to AT&T.  Onvoy altered identifying information for this traffic so that AT&T would perceive it to have originated in Canada.

Krutchen was concerned that these projects were not lawful and he voiced his concerns about these projects to Onvoy's upper management.  In October 2002, Krutchen informed Onvoy's Chief Operating Officer Fritz Hendricks ("Hendricks") about the Canadian Gateway project while giving him a tour of Onvoy's Minneapolis facilities. Krutchen alleges that he specifically told Hendricks that MCI was cheating AT&T.  In January 2003, Krutchen notified Paul Mahoney, General Counsel of Onvoy, that he was concerned about this scheme.  Krutchen was particularly concerned because, at that time, MCI was the sole long distance services provider for the federal government.  Krutchen believed that MCI and Onvoy's scheme may have been replicated in other countries and that U.S. domestic telephone traffic, including law enforcement, government and national defense traffic, was susceptible to foreign surveillance.  Krutchen alleges that he related his concerns quietly because he was the sole income earner for his family and was worried that he would be terminated from his employment.  As far as Krutchen is aware, Onvoy did not respond to his concerns.

---

[3]     Neither MCI or Bell Canada was involved in this scheme.

Krutchen was laid off from Onvoy in January 2003 in connection with downsizing.  In March 2003, Krutchen relayed his concerns to the Federal Bureau of Investigation ("FBI"), but the FBI did not respond to his report.  In May 2003, Krutchen approached William Barr ("Barr"), then General Counsel of Verizon and formerly Attorney General of the United States, and conveyed information regarding the Project Invader and Canadian Gateway schemes.  Barr provided information to the proper authorities resulting in three significant events.  First, the United States Attorney's Office for the Southern District of New York opened a criminal investigation and grand jury proceeding into the conduct of Onvoy and MCI in May 2003, in connection with which Krutchen provided information to federal law enforcement officers, complied with subpoenas, and provided a sworn statement to the grand jury.  Second, the United States' General Services Administration determined that MCI violated federal regulations by engaging in these schemes and barred MCI from bidding on federal contracts.  Third, AT&T sued MCI and Onvoy in September 2003, alleging that Onvoy and MCI engaged in illegal conduct and including claims of fraud and racketeering.  The suit was settled in February 2004; MCI paid AT&T $120 million and Onvoy made a payment to AT&T in an undisclosed amount.

Krutchen alleges that when Onvoy learned of his cooperation with authorities, it held a press conference to denounce him.  Onvoy claimed that it was a "victim of corporate terrorism."  (*Id.* ¶ 22.)  Krutchen contends that Onvoy also falsely claimed that

Krutchen had poor performance reviews and failed to meet expectations,[4] worked to establish a competitor while on Onvoy's payroll, and engaged an attorney to assist him in becoming a shareholder of Onvoy.  Krutchen further alleges that Hendricks attended this press conference and denied that Onvoy had altered identifying information for telephone traffic or otherwise defrauded AT&T.

In August 2003, Krutchen was hired by PPL Telecom and he and his family relocated to Pennsylvania.  During his employment with PPL Telecom, Krutchen received annual performance reviews stating that he exceeded expectations.  He also received performance awards in 2005 and 2007 and a merit based raise in 2007.

In early 2007, Krutchen learned that PPL Telecom was to be sold.  Krutchen was told that he was critical to the success of the transition, and PPL Telecom agreed in writing to provide him with severance benefits of nine months of separation pay if he continued working for PPL Telecom and was fired without cause by PPL Telecom or was not offered a position with PPL Telecom's successor.  In May 2007, Communication Infrastructure Investments, LLC ("CII") announced it would purchase PPL Telecom.[5]

As a result of this transaction, PPL Telecom began operating under the Zayo Bandwidth name and Zayo Bandwidth became the operating company and wholly-owned subsidiary of CII.  Krutchen's employment with PPL Telecom was terminated on

---

[4]     Krutchen alleges he was not a poor employee and that he received performance awards from Onvoy in 2000 and 2002.

[5]     Krutchen alleges CII is a holding company owned by venture capital firms that was organized to acquire and support long-term development of fiber-based bandwidth solutions-oriented businesses.

August 24, 2007, and on August 25, 2007 he became an employee of Zayo Bandwidth. Zayo Bandwidth's offer of employment to Krutchen included its agreement to provide Krutchen with severance benefits equivalent to those he had been offered by PPL Telecom if he was terminated involuntarily, other than for cause, within twelve months after the sale closed.[6]

Two days before the CII purchase of PPL Telecom and its transition to Zayo Bandwidth, Zayo Bandwidth announced it intended to purchase Onvoy. Krutchen was concerned that Zayo Bandwidth's purchase of Onvoy meant that he would be working for the same management personnel who had denounced him when he made his report regarding Onvoy to the authorities in 2003. Krutchen contacted Zayo Bandwidth CEO Dan Caruso ("Caruso") and Zayo Bandwidth's General Counsel to express his reservations. Caruso responded by an e-mail stating, "U might want to reflect on how best to handle a topic like this." (*Id.* ¶ 33.) Krutchen alleges that he believed that neither the CEO nor General Counsel would address his concerns.

CII purchased Onvoy on November 8, 2007. Around the same time, CII formed Zayo Group, which is an umbrella corporation that owns three subsidiaries: Zayo Bandwidth; Onvoy Voice Services; and Zayo Managed Services. Krutchen alleges that there was no clear documentation regarding how Onvoy's personnel, responsibilities, or properties were to be split across the three companies. Also in November 2007, Krutchen

---

[6]     The Amended Complaint does not specify whether Zayo Bandwidth made this agreement orally or in writing.

notified his supervisor Troy Kau ("Kau") about his 2003 whistleblowing activities and the fact that he was a witness in the federal criminal investigation of Onvoy.

In connection with the purchase of Onvoy and the resulting new corporate structure, several executives that had been at Onvoy prior to the purchase, and who were aware of Krutchen's activities or involved in the scheme he reported, were in positions of authority within the new structure. Hendricks, who had been Chief Operating Officer and Vice President at Onvoy prior to the merger became the President of Onvoy Voice Services, and he reported to Caruso, who became President and Chief Executive Officer of Zayo Group. Hendricks, as noted above, participated in the press conference called to denounce Krutchen in 2003. Michael Styba ("Styba"), who was Director of Operations at Onvoy, became the Director of Service Delivery at Zayo Bandwidth. Krutchen alleges that Styba managed the Minneapolis Onvoy facility in 2003 and supported the Canadian Gateway project. Paul Polk ("Polk") was the Manager of Field Services at Onvoy in 2003. Polk became the Manager of Field Service at Zayo Bandwidth. Krutchen alleges that Polk would have been aware of the opinion of Onvoy management in 2003 that Krutchen was a corporate terrorist.

When the Zayo Bandwidth purchase of PPL Telecom became complete, Zayo Bandwidth instructed employees that it was "business as usual" and that existing responsibilities and projects should continue. (*Id.* ¶ 41.) Prior to the purchase, Krutchen had been working on a project with Eric Clelland ("Clelland") from a firm called Cyan Optics to develop a Dense Wave Division Multiplexing Fiber Optic Telecommunications

Platform, and Krutchen understood that this project would continue given Zayo Bandwidth's directive.

In December 12, 2007, Krutchen advised Kau that he wished to attend a trial in Minnesota of a product Cyan Optics was developing. The trial was scheduled to take place at Zayo Bandwidth's Minneapolis facility on January 3, 2008. Kau responded by an e-mail telling Krutchen that the project was not a sufficiently high priority to warrant a business trip to Minnesota. Kau stated that Zayo Bandwidth "cannot afford to spend any extra resources on this" and that he "did not see a need for [Krutchen] to go out for a review" at that time. (*Id.* ¶ 42.) Krutchen alleges that Kau did not want him to attend the product test only because there was "way too much going on" for him to make a trip. (*Id.* ¶ 43.)

Krutchen had scheduled a vacation trip to Minnesota to begin on December 22, 2007; Kau was aware of the trip and approved the vacation time. On December 21, 2007, Kau and Krutchen spoke by telephone and Kau stated that Krutchen should not spend company resources to review equipment in Minnesota. Kau told Krutchen he expected him to work from Minnesota on two other projects, however.

On January 3, 2008, Krutchen met for breakfast with Clelland. Cyan Optics' equipment was deployed at Zayo Bandwidth's Minneapolis facility and Clelland and his staff had access to the facility. After breakfast, Krutchen accompanied Clelland and others to the Zayo Bandwidth facility and observed the test of Cyan Optics' product. Krutchen was at the facility for approximately thirty minutes.

Later that morning, Kau called Krutchen and informed him, without explanation, that his employment was terminated.  That afternoon, Krutchen met with Dan Nestico ("Nestico"), the Manager of Engineering in Minnesota for Zayo Bandwidth, so that Krutchen could turn over company property then in his possession.

Nestico told Krutchen that the policy regarding vendor access and escort policy to Zayo Bandwidth facilities had been changed at 9:00 PM the night before, and that this change had caught Nestico off guard and was a surprise.  Nestico stated he had not had time to inform Clelland or Cyan Optics of the policy change and that they were not to visit Zayo Bandwidth sites unescorted.  Krutchen was unaware of the policy until this conversation with Nestico.

Krutchen received a letter from Zayo Bandwidth's General Counsel dated January 11, 2008.  Krutchen alleges the letter falsely stated that Kau had explained the reason for his termination on January 3, 2008, and that the reason was "violation of numerous Company policies, including but not limited to, insubordination."  (*Id*. ¶ 51.) Zayo Bandwidth claimed that Krutchen "blatant[ly] refused to follow instructions."  (*Id*.) Zayo Bandwidth also claimed that Kau, orally and in writing, instructed Krutchen "not to travel to Minnesota for business purposes and meet with the vendor Cyan."  (*Id*.)

Krutchen claims that he was terminated as a result of his whistleblowing activities in 2003.  Krutchen alleges that due to corporate acquisitions and restructuring, officials of the company against which he blew the whistle were placed in a position to terminate his employment and that they did so only two months after they acquired authority over him. Krutchen contends that Defendants manufactured the charge of insubordination and that

it was a pretext for Defendants' activities.  Krutchen's Amended Complaint asserts nine

counts against Defendants.

Defendants assert Krutchen fails to state a claim upon which this Court can grant

relief with respect to six of the counts alleged.[7]  Specifically, Defendants challenge

Krutchen's claims under the Minnesota Whistleblower Act, common law whistleblower

claims, claims of promissory estoppel, tortious interference with contract and defamation,

and his claims under 42 U.S.C. § 1985.  Defendants also request that references to certain

damages items be stricken from the Amended Complaint.  Defendants do not challenge

Krutchen's breach of contract claims, his claims for unjust enrichment, or his claims

alleging violation of Pennsylvania's wage laws.[8]  With respect to these claims,

Defendants request that this Court transfer venue to the United States District Court for

the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404.

## DISCUSSION

### I.     Standard of Review

In deciding a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, a court assumes all facts in the complaint to be true and construes all

reasonable inferences from those facts in the light most favorable to the complainant.

---

[7]     Defendants have taken a "kitchen sink" approach with regard to this motion.  A number of the Defendants' arguments lack legal or factual foundation, ignore or mischaracterize relevant case law and statutory provisions, are inconsistent with other arguments, or are internally inconsistent.

[8]     Krutchen asserts that Zayo Bandwidth failed to pay him a bonus to which he was entitled and also failed to reimburse him for business expenses incurred prior to his termination.

*Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986).  In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens,* 183 F.3d 799, 805 (8th Cir.  1999), or legal conclusions drawn by the pleader from the facts alleged.   *Westcott v. City of Omaha,* 901 F.2d 1486, 1488 (8th Cir. 1990).  A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6).   *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."   *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1974 (2007).  Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level."  *Id.* at 1964-65.  This standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  *Id.* at 1965.

## II.    Minnesota Whistleblower Act

Defendants argue that Krutchen fails to state a claim under the Minnesota Whistleblower Act, Minnesota Statute section 181.932.  Defendants first argue that the statute does not apply to Krutchen because he was employed by Zayo Bandwidth in Pennsylvania.  Defendants also argue that Krutchen has failed to allege facts satisfying the statutory criteria required to allege a Whistleblower Act claim.  The Court disagrees.

### A.    Application of the Minnesota Whistleblower Act

Generally, the employee-employer relationship in Minnesota is at-will, meaning

that the relationship can be terminated for any reason or for no reason at all.

*Anderson-Johanningmeier v. Mid-Minnesota Women's Ctr., Inc.,* 637 N.W.2d 270, 273

(Minn. 2002).  Minnesota law, however, provides that:

> An employer shall not discharge, discipline, threaten, otherwise
> discriminate against, or penalize an employee regarding the employee's
> compensation, terms, conditions, location, or privileges of employment
> because:
>
> (a) the employee, or a person acting on behalf of an employee, in good
> faith, reports a violation or suspected violation of any federal or state law or
> rule adopted pursuant to law to an employer or to any governmental body
> or law enforcement official . . . .

Minn. Stat. § 181.932.  The term "employee" is defined as "a person who performs

services for hire in Minnesota for an employer."  Minn. Stat. § 181.931, subd. 2.

This case presents an unusual factual scenario.  When the facts are viewed in the

light most favorable to Krutchen, however, the Court concludes he has stated a claim as

an employee under the Minnesota Whistleblower Act.

Krutchen was an employee of Onvoy in Minnesota, learned of its unlawful

activities in Minnesota, and reported on those activities in Minnesota.  Though Krutchen

was employed in Pennsylvania at the time of his termination and was on vacation in

Minnesota, his supervisor told him he was expected to work from Minnesota on two

projects.  Krutchen did perform work for Zayo Bandwidth on one of these projects during

his Minnesota vacation.  During his time in Minnesota, he attended a product trial at his

employer's Minnesota facility in connection with a long-term, work-related project.

Though Defendants claim that Krutchen's attendance at this test violated his supervisor's instructions and was insubordinate, when the facts are viewed in the light most favorable to Krutchen, his attendance at the vendor test was not insubordination. According to Krutchen, his mere presence at the test was not forbidden; he was instructed not to spend company resources attending the test and he did not.[9] Krutchen was terminated while in Minnesota, and he met with a company official in Minnesota to turn over company property then in his possession, which is an act occurring within the scope of his employment. While any single fact among these might not warrant finding that Krutchen states a claim, when viewed in context, the Court concludes that Krutchen has met this initial hurdle.

The Court's application of this statute to Krutchen comports with prior cases affording a broad construction to the term "employee." For instance, the Minnesota Whistleblower Act has been held to apply to claims by a plaintiff who had visited the Minnesota office of his employer only once and in whose allegations all significant events took place outside Minnesota. *Kozloski v. Am. Tissue Servs. Found.*, Civil No. 06-295 (DSD/JJG), 2007 WL 2885365 (D. Minn. Sept. 27, 2007). The nexus between Krutchen's claims and Minnesota is closer than that alleged by the plaintiff in *Kozloski*.

---

[9]     The Court's opinion should not be construed to provide Whistleblower Act protection for an employee of an employer in another state who ventures only tangentially or without authorization into Minnesota.

The Defendants argue that allowing Krutchen to make a claim under the Minnesota Whistleblower Act signals that any employee performing a work activity while on vacation may claim the protection of the laws of their vacation jurisdiction. Thus, Defendants claim that "a sales representative sunning herself in Cabo San Lucas [would be] protected by Mexican law; a computer software engineer hunting in Ontario [would be] protected by Canadian law . . . ." (Doc. No. 8 at 10.)  The Court disagrees with this argument because the Minnesota Whistleblower Act only governs conduct by an "employer," which is defined in relevant part as "any person having one or more employees in Minnesota . . . ."  Minn. Stat. § 181.931, subd. 3.  Therefore, the statute will only apply when the defendant employer also operates within Minnesota.  Here, Krutchen alleges that his employer Zayo Bandwidth employed persons within Minnesota, satisfying this definition.  Further, the Defendants' argument ignores the other significant employment-related connections between Krutchen's claim and work he performed for hire in Minnesota.  A person on vacation in Minnesota who happens to do some work during their visit would not be considered an "employee" under the Minnesota Whistleblower Act unless he or she could allege significant additional employment-related connections to Minnesota, as Krutchen does here.

### B.     Claims under the Whistleblower Act

Claims under Minnesota Statute section 181.932 are analyzed under the *McDonnell Douglas* burden-shifting test.  *Cokley v. City of Otsego,* 623 N.W.2d 625, 630 (Minn. App. 2001); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569 (Minn. 1987).  Under this test, the

employee must first establish a prima facie case of retaliatory discharge under Minn. Stat. § 181.932, subd. (1)(a), by showing: (1) statutorily protected conduct; (2) adverse employment action; and (3) a causal nexus between the two. *Cokley*, 623 N.W.2d at 630. If the employee can establish a prima facie case, the burden of production shifts to the employer to articulate a legitimate, nonretaliatory reason for its action. *Id.* If the employer meets its burden of production, the employee must demonstrate that the employer's articulated justification is pretextual. *Id.* At all times the employee has the burden to prove by a preponderance of evidence that the employer's action was taken for an impermissible reason. *Phipps,* 408 N.W.2d at 572.

Defendants attack Krutchen's Whistleblower Act claim on three grounds. First, Defendants argue that Krutchen has not reported an unlawful activity by his employer, Zayo Bandwidth. Second, Defendants contend Krutchen has not reported a current violation of law. Third, Defendants assert that Krutchen has not sufficiently alleged causation, i.e., that he was terminated as a result of his protected activity.

### 1. Krutchen's employer

At the time of his termination, Krutchen was employed by Zayo Bandwidth, but he blew the whistle about the activities of Onvoy. Defendants contend that because he blew the whistle about a company other than his employer at the time of termination, Krutchen does not state a claim under the Whistleblower Act. The Court disagrees.

Krutchen alleges that Zayo Bandwidth was a sister subsidiary with Onvoy under the control of the same corporate parent, Zayo Group. Krutchen alleges that management personnel who were at Onvoy when he blew the whistle became key decision-makers and

executives within each of the Defendant entities after Zayo Bandwidth purchased Onvoy.

Krutchen alleges that these executives were aware of his whistleblowing in 2003 and that

one of them even participated in a press event in which he was named and publicly

disparaged. Finally, Krutchen alleges that two months after these decision-makers gained

their positions, he was fired, and he alleges a connection between his whistleblowing and

his termination.[10]

There are no Minnesota cases directly addressing the situation presented here,

where an employee alleges he engaged in a protected activity with respect to one

employer and is later terminated by another employer operating within the same

corporate structure. The Court concludes, however, that the purpose of the Minnesota

Whistleblower Act would not be served by allowing companies to shelter themselves

from liability by hiding behind their corporate structure if, in fact, decision-makers of one

company are able to direct the activities of another company such that an employee is

terminated for engaging in protected activity.

In actions under the Minnesota Human Rights Act ("MHRA"), courts have

examined whether related companies can be considered an "integrated enterprise" to

determine whether to treat such companies as stand-alone entities or whether to consider

the actions of one company in connection with those of another. For instance, the test has

been applied to determine if jurisdiction exists under the MHRA where a corporation and

its subsidiaries are not operated independently. *Fahey v. Avnet, Inc.*, 525 N.W.2d 568,

---

[10]     Krutchen may not bring claims against these executives personally under the
Whistleblower Act. *Obst v. Microtron, Inc.*, 588 N.W.2d 550 (Minn. Ct. App. 1999).

572 (Minn. Ct. App. 1994) (noting the development of the integrated enterprise test in

Title VII cases); Minn. Stat. § 363.03.  The test has also been applied to permit an

employee to present sex discrimination claims under Title VII and the MHRA against

two related entities by considering both to be her employer.  *Johns v. Harborage I, Ltd.*,

585 N.W.2d 853 (Minn. Ct. App. 1998).  Further, at least one court has utilized the test in

a case under another state's whistleblower act.  *Batchelder v. Realty Res. Hospitality,*

*LLC*, 914 A.2d 1116 (Me. 2007).

The integrated enterprise test uses standards developed by the National Labor

Relations Board and examines four factors:  (1) common ownership or financial control;

(2) centralized control of labor relations; (3) interrelation of operations; and (4) common

management.  *Fahey*, 525 N.W.2d at 572; *Baker v. Stuart Broad. Co.*, 560 F.2d 389 (8th

Cir. 1977).  The presence of one of the factors is not determinative, but all four of the

factors need not be present in order to conclude that related companies are operating as

an integrated enterprise.  *Fahey*, 525 N.W.2d at 572.

Krutchen's Amended Complaint states that when the purchase of Onvoy became

complete, there "was no clear documentation as to how the former Onvoy personnel,

responsibilities, services or properties were to be split across the three companies."  (Doc.

No. 6 ¶ 37.)  Krutchen alleges, however, that executives from Onvoy were deployed

across all three companies, including his employer Zayo Bandwidth, suggesting there

was an interrelation of operations among the companies.  *See Doe v. Lutheran High Sch.*

*of Greater Minneapolis*, 702 N.W.2d 322 329, 330 (Minn. Ct. App. 2005) (stating that

this factor refers to whether the entities share office space, sell services, or transfer

employees).  Krutchen also alleges Onvoy and Zayo Bandwidth were sister subsidiaries under the common control of Zayo Group.  The Court concludes that Krutchen has stated sufficient facts to survive a motion to dismiss because he has raised a reasonable expectation that discovery will reveal evidence of his claim.  *Twombly,* 127 S. Ct. at 1965.  If discovery fails to show a sufficient connection between the Defendants for Krutchen to prove his claims, the Court anticipates it will revisit this issue.

The Court also declines to consider Krutchen merely as a former employee of Onvoy.  Claims under the Minnesota Whistleblower Act generally may not be brought against a claimant's former employer because the statute applies only to employees in an existing employment relationship when they are terminated.  *Guercio v. Prod. Automation Corp.*, 664 N.W.2d 379, 388 (Minn. Ct. App. 2003).  Here, however, Krutchen alleges he was fired by his then-existing employer, Zayo Bandwidth, as a result of his whistleblowing activities at Onvoy, when executives from Onvoy became executives with Zayo Bandwidth and Zayo Group.  The Court concludes that this satisfies the requirement that a claimant under the Whistleblower Act be a current employee.

## 2.     Current Violation of Law

Defendants contend that Krutchen fails to state a claim under the Whistleblower Act because he was terminated in 2008, but the practices he reported occurred in 2003 and before.  Therefore, Defendants contend that Krutchen's report related to past practices and does not constitute protected activity.

In *Cokely*, the court determined that the claimant made a "non-specific reference to past practices" which was "insufficient to implicate a current violation of law or public

policy." 623 N.W.2d at 631.  The court concluded that this did not constitute a report for

the purposes of the Whistleblower Act and that the claimant could not show she engaged

in protected activity.  *Cokely* does not apply here.  Krutchen did not make a report in

2008 about practices occurring in 2003.  Further, Krutchen's report was not a

"non-specific reference to past practices . . . insufficient to implicate a current violation

of law."  *Id.*  In 2003, Krutchen reported on an existing, multi-million dollar scheme to

defraud another company and his report led to a criminal investigation and a very

expensive lawsuit.  Krutchen contends it simply took until 2008 for Onvoy executives to

be in a position to terminate him.  The Court concludes that Krutchen's 2003 report

satisfies the standard to show he engaged in protected activity under the Whistleblower

Act.

        3.     Causation

     Defendants contend that Krutchen is unable to show a causal connection between

his protected activity and his termination because the time that elapsed between his report

and his firing makes the causal nexus too remote.  The Court disagrees.

     Retaliatory motive is difficult to prove by direct evidence.  *Id.* at 632.  Thus, "an

employee may demonstrate a causal connection by circumstantial evidence that justifies

an inference of retaliatory motive."  *Id.*  A claimant under the Whistleblower Act may

establish an inference of reprisal by showing a close temporal proximity between the

statutorily protected activity and the termination.  *Id.* at 633.  In *Hubbard v. United Press

International, Inc.*, the court found that a genuine issue of fact existed with respect to

causation where the plaintiff was terminated two days after service of his complaint

alleging retaliation under the MHRA.  330 N.W.2d 428, 445 (Minn. 1983); *see also*

*Tretter v. Liquipak Int'l, Inc.,* 356 N.W.2d 713, 715 (Minn. Ct. App. 1984) (finding

inference of causal connection established under the MHRA when an employee was

demoted 3 months after complaining about her manager and was terminated 6 months

later).

The relevant time period to consider in this case is not the time between

Krutchen's 2003 report and his 2008 termination.  For most of that time, the executives at

Onvoy on whom Krutchen blew the whistle were not in a position to take adverse action

against his employment.[11]  The power to fire Krutchen did not arise until Zayo

Bandwidth purchased Onvoy in November 2007, and executives from Onvoy achieved

leadership positions within all three Defendant entities.  Krutchen was terminated less

than two months later.  The Court concludes that, viewing the facts in the light most

favorable to Krutchen, he has established an inference of retaliatory motive.  Therefore,

Krutchen states a claim under the Minnesota Whistleblower Act.

## II.    Common Law Whistleblower Claims

Krutchen also asserts a cause of action under Minnesota's common law

whistleblower protections.  Though Minnesota has enacted a statutory whistleblower

protection statute, Minnesota law also recognizes common law wrongful discharge

claims.  *Phipps,* 408 N.W.2d 569 (upholding Minnesota Court of Appeals' recognition of

common law claim for wrongful termination though Minnesota Whistleblower Act

---

[11]    As they could not fire him at the time of his report, Krutchen alleges that they took
a different step; they held a press conference to vilify him publicly.

passed in intervening time between that court's decision and Minnesota Supreme Court's consideration of the case); *Nelson v. Productive Alternatives, Inc.*, 715 N.W.2d 452 (Minn. 2006) (holding that Minnesota Whistleblower Act did not expressly modify the common law and that the statute does not preclude common law wrongful discharge actions).

The common law claim recognized in Minnesota, however, is a very narrow one. To state a claim for common law wrongful discharge, the employee must show that he or she was discharged for "refusing to participate in an activity that the employee, in good faith, believes violates any state or federal law or rule or regulation adopted pursuant to law." *Phipps*, 408 N.W.2d at 571; *Nelson*, 715 N.W.2d at 455.

In Count II of his Amended Complaint, Krutchen states that he was terminated "in violation of a clear mandate of public policy, either legislatively or judicially recognized." (Doc. No. 6 ¶ 61.)  Krutchen alleges he was terminated for reporting unlawful behavior and for participating in an investigation.  He does not, however, allege that he was terminated for refusing to participate in an activity he believed violated the law.  The Court concludes that Krutchen fails to state a claim for common law wrongful discharge under the narrow cause of action recognized in *Phipps*, and the Court declines to recognize new common law wrongful discharge theories as Krutchen urges. Therefore, the Court dismisses Count II of Krutchen's Amended Complaint for failure to state a claim.

### III.    Promissory Estoppel

Krutchen alleges that Zayo Bandwidth agreed to provide him with severance benefits equivalent to those previously provided to him by PPL Telecom if his employment was involuntarily terminated, other than for cause, within twelve months after the sale to Zayo Bandwidth closed.  In Count IV of his Amended Complaint, Krutchen alleges that Zayo Bandwidth made a clear and definite promise with respect to the severance benefits, that it intended to and did induce his reliance, that he acted on that reliance by accepting Zayo Bandwidth's job offer, and that he relied on Zayo Bandwidth's promise to his detriment.  Therefore, Krutchen asserts a claim against Zayo Bandwidth under the doctrine of promissory estoppel.

Promissory estoppel is a creature of equity which implies "a contract in law where none exists in fact."  *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn. 1981).  The elements of the doctrine of promissory estoppel are:  (1) was there a clear and definite promise; (2) did the promisor intend to induce reliance, and did such reliance occur; and (3) must the promise be enforced to prevent an injustice.  *Ruud v. Great Plains Supply, Inc.,* 526 N.W.2d 369, 372 (Minn. 1995).

Defendants challenge Krutchen's promissory estoppel claim on two grounds. First, Defendants contend that the promise made by Zayo Bandwidth was not clear or definite enough for the doctrine to apply.  Minnesota courts have held that vague statements and statements of policy do not give rise to a claim of promissory estoppel. *Id*. at 371-372 (holding that statements made to employee that "good employees are taken care of" and characterizing plaintiff as a "good employee" were policy statements of

general good will toward employee and were insufficient to trigger promissory estoppel

claim).  As alleged here, however, Zayo Bandwidth agreed that it would provide to

Krutchen severance benefits equivalent to those provided by PPL Telecom in the event of

involuntary termination other than for cause.  This is entirely dissimilar to the vague

statement in *Ruud* and is sufficiently clear and definite to meet the first prong of a

promissory estoppel claim.

Second, Defendants contend that Krutchen has not alleged detrimental reliance.

Mere speculation is insufficient to show reliance; an actual change in an employee's

position is required.  *See Dumas v. Kessler & McGuire Funeral Home, Inc.,* 380 N.W.2d

544, 548 (Minn. Ct. App. 1986) (holding continued employment with employer not

sufficient reliance to support promissory estoppel claim where supervisor stated he and

employee would "retire together" and employee did not claim he turned down other

offers); *Eklund v. Vincent Brass and Aluminum Co.,* 351 N.W.2d 371, 378 (Minn. Ct.

App. 1984) (holding sufficient reliance shown where employee turned down actual job

offer from another employer in reliance on employer's promise).  Defendants contend

Krutchen has not shown he turned down other employment opportunities and, therefore,

contend his promissory estoppel claim is deficient.

Viewing the facts in the light most favorable to Krutchen, he has shown

detrimental reliance.  Krutchen does not allege continued employment with the same

employer following the promise at issue.  Instead, Krutchen's employment with PPL

Telecom ended and he was hired by Zayo Bandwidth.  Krutchen alleges that he had

voiced some fears regarding his job with respect to the sale to Zayo Bandwidth due to his

whistleblowing activities.  Zayo Bandwidth's offer of severance benefits if he were terminated other than for cause could have induced his reliance and his decision to accept employment with Zayo Bandwidth; at least if he were terminated he would be compensated under the severance agreement.  Krutchen alleges he relied on this promise to his detriment.  The Court, therefore, declines to dismiss Krutchen's promissory estoppel claim.

This is not to say that Krutchen's promissory estoppel claim is without defect. The primary deficiency with the claim, however, is one that Defendants ignore – Krutchen has alleged both a claim of promissory estoppel and that he had a contract with Zayo Bandwidth.  The doctrine of promissory estoppel implies a contract where none exists; the doctrine does not apply when an actual contract has been formed.  *Gorham v. Benson Optical*, 539 N.W.2d 798, 801-802 (Minn. Ct. App. 1995).  Minnesota law recognizes an exception to this principle with respect to at-will employment contracts. *Grouse,* 306 N.W.2d 114.  In *Grouse*, a pharmacist accepted a job offer, resigned his current position, and turned down another offer, after which the pharmacy hired someone else.  *Id*. at 115-116.  The court permitted him to seek reliance damages, although there had been an offer and acceptance, because neither party was committed to performance due to the bilateral power of termination inherent in the at-will employment relationship, rendering the promises illusory.  *Id*. at 116.  This exception does not apply here because Krutchen is not alleging that Zayo Bandwidth failed to hire him or continue his employment pursuant to a promise.  Instead, Krutchen's claim relates to a specific agreement by Zayo Bandwidth to provide severance benefits upon his termination other

than for cause, and his claim for promissory estoppel related to these benefits is identical to his claim for breach of contract.

As Krutchen's promissory estoppel claim is duplicative of his breach of contract claim, only one may ultimately proceed.  Defendants, however, have not yet answered and it is unclear whether Krutchen's allegation that he and Zayo Bandwidth had a contract will be challenged.  The Court will, therefore, permit Krutchen to go forward with his promissory estoppel claim as an alternative theory subject to later challenge as the record becomes more fully developed.

## IV.   Tortious Interference

A claim of tortious interference with contract has five elements:  (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.  *Kjesbo v. Ricks,* 517 N.W.2d 585, 588 (Minn. 1994).  Krutchen has pled a claim of tortious interference with contract against Zayo Group and Onvoy alleging that these two defendants were aware of his severance agreement with Zayo Bandwidth and without justification interfered with the contract.

Defendants contend that Krutchen cannot state a claim for tortious interference because he has not identified a third-party against which to bring the claim.  Defendants argue that Zayo Group "owned the employment relationship between Krutchen and Zayo [Bandwidth] and Zayo [Bandwidth's] executives are the former Onvoy employees Krutchen believes are behind this interference."  (Doc. No. 8 at 19.)  Defendants assert

that Krutchen's claim requires a determination that Zayo Bandwidth interfered with its own contract.

Krutchen alleges that his severance contract was with Zayo Bandwidth and that Zayo Group and Onvoy tortiously interfered with that contract, leading to the claimed breach – the failure to pay severance benefits.  Zayo Group and Onvoy are separate entities from Zayo Bandwidth.[12]  While Zayo Group is the corporate parent to Zayo Bandwidth and Onvoy, the Court is unwilling to conclude on the record before it that, as a matter of law, Zayo Group could not interfere with its subsidiaries' contracts.  The Court, therefore, disagrees with Defendants and concludes that Krutchen states a claim for tortious interference.

## V.      Defamation

Krutchen's Amended Complaint asserts a claim of defamation.  Specifically, Krutchen alleges that his supervisor, Kau, as an agent for Zayo Bandwidth, falsely advised others at Zayo Bandwith and/or at Zayo Group that he instructed Krutchen not to attend the Cyan Optics product trial, that Krutchen defied the instruction, that Krutchen was insubordinate, and that Krutchen violated other policies of his employer.  Defendants assert that Krutchen fails to state a claim for defamation.

---

[12]     The Court notes that the Defendants ask the Court to consider them as separate entities with respect to some claims and as one entity with respect to other claims. Krutchen's claims require a similar construct.  Neither party has provided the Court with a concrete analysis regarding whether parties considered to be an integrated entity under the Whistleblower Act can be considered separately for a claim of tortious interference. At this stage of the proceeding, viewing all facts in the light most favorable to Krutchen, the Court concludes that Krutchen has stated his claims against Defendants with respect to both counts.  It is likely, however, that the Court will revisit this issue at a later date.

The elements of defamation are:  (1) a false and defamatory statement about the plaintiff; (2) publication of that statement to a third party; and (3) harm to the plaintiff's reputation.  *Weinberger v. Maplewood Review,* 668 N.W.2d 667, 673 (Minn. 2003). Defamation that affects a plaintiff in his or her business, trade, or profession is defamation per se and is actionable without proof of actual damages.  *Stuempges v. Parke, Davis & Co*, 297 N.W.2d 252, 255 (Minn. 1980).

Defendants make several arguments with respect to Krutchen's defamation claim. First, Defendants contend that Krutchen has admitted that Kau's statements were true. The truth of a statement is an absolute defense to a defamation claim.  *Id.*  Defendants' argument, however, stretches the record and ignores the requirement that the Court consider the facts in the light most favorable to Krutchen.

Krutchen alleges he was told not to spend company resources attending the trial, and he alleges he did not spend such resources.  Krutchen does not agree that he was told not to attend the vendor trial at all.  Therefore, viewing the facts in the light most favorable to Krutchen, he was not, and has not agreed he was, insubordinate.

Further, Krutchen does not agree that he admitted violating other company policies.  Defendants argue that Krutchen violated company policy by allowing Cyan Optics to visit Zayo Bandwidth's site unaccompanied.  Krutchen alleges, however, that Cyan Optics' equipment was deployed within Zayo Bandwidth's site, Clelland and his staff had access to the facility without regard to Krutchen's presence or facility access, and the product test had been scheduled long before.  According to the Amended Complaint, an e-mail was sent the night before the product trial changing the company's

access policy; this policy change was a surprise, it had not been communicated to Cyan Optics, and Krutchen had previously been unaware of the policy.  Under the circumstances, Krutchen has not admitted he violated a company policy by attending the vendor product trial.

Second, Defendants contend Krutchen has not sufficiently alleged publication of the false or defamatory statements.  Defendants argue that Krutchen's allegation that Kau published his statements to "others at Zayo Bandwidth and/or Zayo Group" is insufficiently specific.  A claim of defamation must be pled with specificity and must include allegations as to who made the statements, to whom they were made, and where. *Pope v. ESA Servs., Inc.,* 406 F.3d 1001, 1011 (8th Cir. 2005).  Krutchen has identified the speaker, the statements, the context and time in which they were made, and has generally identified to whom they were made:  other employees of Zayo Bandwidth and Zayo Group.  Krutchen has also specifically identified Zayo Bandwidth's General Counsel as a person to whom Kau communicated the statements.  That Krutchen cannot identify with certainty the persons to whom the statements were made is not fatal at this stage of the case; Krutchen has identified a small pool of potential persons to whom the statements were communicated and can discover the identity of those parties by deposing Kau.  The Court concludes that Krutchen's claim is stated with sufficient specificity.

Third, Defendants contend that Kau's statements to Zayo Bandwidth's General Counsel were not defamatory because the communication was privileged.  Minnesota law recognizes that communications between employees of a corporation can constitute defamatory publication.  *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 143 (Minn.

1986) (concluding a statement made by one employee to another can constitute publication and rejecting theory that such communication is made to the corporation itself and is not published to a third person).  A party has no liability for defamation, however, when statements are subject to a qualified privilege; statements made between employees and employers "in good faith and for a legitimate purpose" have been considered to fall within this privilege.  *Karnes v. Milo Beauty & Barber Supply C*o., Inc., 441 N.W.2d 565, 568 (Minn. Ct. App. 1989).

Krutchen alleges, however, that Kau made the statements with malice as part of Zayo Bandwidth's manufacture of a pretextual reason for Krutchen's termination. Statements made with malice are an abuse of the qualified privilege and overcome the protection the privilege affords.  *Id.*, *see also Hebner v. Great N. Ry. Co.*, 80 N.W. 1128, 1129 (Minn. 1899) (stating that [t]he law is that a communication, to be privileged, must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause").  The plaintiff bears the burden to prove actual malice, which is defined in Minnesota law as "actual ill will, or a design causelessly and wantonly to injure plaintiff."  *Frankson*, 394 N.W.2d at 144 (quoting *McBride v. Sears, Roebuck & Co.,* 235 N.W.2d 371, 375 (1975)).  Courts have generally held that whether the privilege has been abused because the communicating party acted with malice is a question for the jury.  *Stuempges*, 297 N.W.2d at 257; *Frankson*, 394 N.W.2d at 144. Krutchen has alleged sufficient facts to state a claim that Kau published false statements with malice.  Therefore, the Court denies Defendants' motion to dismiss as to Krutchen's defamation claim.

**VI.    42 U.S.C. § 1985**

Krutchen asserts a claim against the Defendants under 42 U.S.C. § 1985, alleging that the Defendants conspired to injure him in retaliation for his having attended and submitted testimony in a federal grand jury proceeding.  Defendants argue Krutchen fails to state a claim regarding this count under several theories.

First, Defendants argue that the statute applies when parties conspire to prevent a person from testifying.  Defendants contend Krutchen was not prevented from testifying and, therefore, that he does not state a claim.

Section 1985(2) deals with obstruction with respect to participation in court proceedings.[13]  That section identifies such civil conspiracies, in part, as follows:

> If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified . . . .

42 U.S.C. § 1985(2).  Defendants' argument is focused on the first conspiracy identified in the statute cited above, but ignores the next part of the statute, which addresses civil conspiracies to "injure such party or witness in his person or property on account of his having so attended or testified . . . ." *Id*.  The statute contemplates a cause of action not only for preventing a person from testifying, but also for retaliating against a person for having done so.  *See Haddle v. Garrison*, 525 U.S. 121 (1998) (recognizing a cause of

---

[13]    Section 1985(3) creates a cause of action for the injuries caused pursuant to a conspiracy identified in section 1985(2).

action under 42 U.S.C. § 1985(2) for termination of at-will employment in case where former employer retaliated against employee for appearing in federal court pursuant to a grand jury subpoena and to intimidate him regarding expected testimony in a criminal case). Krutchen alleges retaliation and his claim falls within the statute's language.

Second, Defendants argue that Krutchen fails to state a claim because the grand jury proceeding in which he offered testimony is no longer pending. Defendants contend that such a proceeding must be pending at the time of the retaliation for Krutchen to state a claim. The Court disagrees.

Courts have held that the existence of an underlying proceeding in federal court is a prerequisite to a claim under 42 U.S.C. § 1985(2). *See, e.g., Deubert v. Gulf Fed. Sav. Bank*, 820 F.2d 754 (5th Cir. 1987) (holding that a claim under section 1985(2) must be based on a nexus between the conspiracy and a federal court proceeding, for which administrative proceedings did not qualify); *Deretich v. Office of Admin. Hearings, State of Minn.*, 798 F.2d 1147 (8th Cir. 1986) (holding no cause of action could be maintained under section 1985 for intimidation of a witness in state administrative and court proceedings). Further, when a plaintiff claims the object of the civil conspiracy was to intimidate him or her to prevent testimony, the alleged intimidation must have taken place while a federal proceeding is pending. *Northrup v. Conseco Fin. Corp.*, 141 F. Supp. 2d 1372 (M.D. Ga. 2001). The same does not hold true, however, with regard to a retaliation claim and the Court concludes a currently pending federal proceeding is not a prerequisite to such a claim.

Defendants cite no authority on point for their claim that section 1985(2) requires that retaliation for testimony offered in a federal court proceeding must occur while the proceeding is still pending.  To give the statute the construction urged by the Defendants would permit victims of civil conspiracy to suffer retaliation, without redress, as soon as the proceeding in which they testified closes; the conspirators would need only to wait until then to take action.  The Court concludes that Congress did not intend to offer so narrow a window of protection to victims of a civil conspiracy to retaliate against a witness or party under section 1985(2).

It is undisputed that Krutchen offered testimony in connection with a federal grand jury proceeding.  The retaliation he alleges simply took place later when his former employers found themselves in a position to terminate him.  Therefore, the Court concludes Krutchen provided testimony in connection with a proceeding pending in federal court as contemplated for a claim under section 1985(2).

Finally, Defendants contend that Krutchen has failed to plead civil conspiracy with sufficient particularity.[14]  The principal elements of conspiracy are "an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Gometz v. Culwell*, 850 F.2d 461, 464 (8th Cir. 1988) (citing

---

[14]     Defendants argue that Krutchen has essentially alleged that Zayo Bandwidth conspired with itself to terminate him.  The Court's analysis with respect to this argument is the same as that explained above – Zayo Bandwidth, Zayo Group and Onvoy are all separate entities.  Ultimately, Krutchen may be unable to prove that each took part in the alleged activities, but at this stage of the proceeding the Court declines to consider them as an integrated entity with respect to claims other than those under the Whistleblower Act.

*Mizokami Bros., Inc. v. Mobay Chem. Corp.,* 660 F.2d 712, 718 n.8 (8th Cir. 1981)).  A plaintiff must allege the conspiracy with "sufficient particularity," demonstrating with "specific material facts" that the parties reached some agreement and conspired together to injure the plaintiff.  *Id.*

Krutchen has alleged that he was fired by Zayo Bandwidth for blowing the whistle on Onvoy's fraudulent activities, which included providing federal grand jury testimony. He has identified specific persons he believes were involved in the decision to terminate him.  He has identified the means by which they accomplished the termination.  Though his allegations would be insufficient to survive summary judgment or to prevail at trial, they contain enough specificity to rise above speculation and involve sufficient facts to raise a reasonable expectation that evidence in support of the claim will be revealed through discovery.  *Twombly*, 127 S. Ct. at 1965.  The Court, therefore, declines to dismiss Krutchen's claim under 42 U.S.C. § 1985.

## VII.   Punitive Damages

Defendants request that several references to damages be stricken from the Amended Complaint.  Krutchen claims that he has suffered damages in excess of $1 million and also asserts a claim for punitive damages.

Under Minnesota law, if a party claims unliquidated damages in an amount greater than $50,000, the party "shall state merely that recovery of reasonable damages in an amount greater than $50,000 is sought."  Minn. Stat. § 544.36.  Further, "[p]unitive damages shall be allowed in civil actions only upon clear and convincing evidence that the acts of the defendant show deliberate disregard for the rights or safety of others."

Minn. Stat. § 549.20, subd. 1(a).  The statute further provides that a trier of fact must determine whether compensatory damages are warranted and then consider whether punitive damages should be awarded in a separate proceeding.  Minn. Stat. § 549.20, subd. 4.

Krutchen originally filed this case in Minnesota state court and it was removed to this Court by Defendants.  Krutchen would, therefore, have been required to adhere to the pleading restrictions noted above and the Court sees no prejudice to Krutchen in applying Minnesota law here.  The Court, therefore, grants Defendants' request with respect to these items of damages.  The Court will consider the unliquidated damages amount claimed by Krutchen to be in excess of $50,000, and actual amounts of his damages may be ascertained through discovery.  Further, the Court strikes without prejudice his claim for punitive damages; Krutchen may reassert his right to claim such damages at a later date.

## VIII.  Transfer of Venue

Defendants request that this Court transfer venue to the United States District Court for the Eastern District of Pennsylvania.  Under 28 U.S.C. § 1404(a), this Court may transfer the case "for the convenience of parties and witnesses, in the interest of justice . . . to any other district or division where it might have been brought."  In considering the convenience of the parties and witnesses and the interests of justice in determining whether to transfer a lawsuit pursuant to section 1404(a), the court must look to the particular circumstances of the case before it.  *Terra Int'l, Inc. v. Miss. Chem. Corp.,* 119 F.3d 688, 691 (8th Cir. 1997).

Here, though Krutchen is a Pennsylvania resident, he chose to litigate in Minnesota.  Onvoy is a Minnesota company, while Zayo Bandwidth and Zayo Group have their principal places of business in Colorado.  Pennsylvania does not appear to be a more convenient forum for the parties than Minnesota.  Certain witnesses may be located in Pennsylvania, but other witnesses are identified as residing in Minnesota, Colorado, and Montana.  The Court concludes that the convenience of the witnesses does not necessitate a transfer of the case to Pennsylvania.  With regard to the interests of justice, Defendants' primary argument relating to this factor is that Krutchen's claims under Minnesota law are meritless.  The Court does not agree and finds the interests of justice do not warrant transfer.  Further, Krutchen alleges many connections with Minnesota which form the crux of his case.  Therefore, the particular circumstances of this case justify hearing the matter here.

## CONCLUSION

The Court concludes that Krutchen has stated a claim with respect to all of the challenged counts of his Amended Complaint except his Minnesota common law whistleblower claim.  The Court, therefore, grants the Defendants' motion to dismiss as to that claim and denies the Defendants' request to dismiss the other counts.  The Court also grants the Defendants' request to strike Krutchen's references to certain damages amounts.  The Court denies the Defendants' request that the Court transfer this case to the Eastern District of Pennsylvania.

Accordingly, **IT IS HEREBY ORDERED** that:

1.      Defendants' Motion to Dismiss and Transfer (Doc. No. 7) is **GRANTED**

**IN PART** and **DENIED IN PART** as follows:

a.      Defendants' Motion to Dismiss is **GRANTED** with respect to

Count II of the Amended Complaint.

b.      Defendants' Motion to Dismiss is **DENIED** as to Counts I,

IV, V, VI and IX of the Amended Complaint.

c.      Defendants' request that the Court transfer venue is

**DENIED**.

Dated:  December 4, 2008                    s/Donovan W. Frank
                                            DONOVAN W. FRANK
                                            Judge of United States District Court