# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

James C. Krutchen,                                    Civil No. 08-4737 (DWF/FLN)

          Plaintiff,

v.                                                    **MEMORANDUM**
                                                      **OPINION AND ORDER**

Zayo Bandwidth Northeast, LLC;
Onvoy, Inc., d/b/a Onvoy Voice
Services; and Zayo Group, Inc.,

          Defendants.

---

John D. Thompson, Esq., and Natalie Wyatt-Brown, Esq., Oberman Thompson & Segal, LLC, counsel for Plaintiff.

Sarah M. Fleegel, Esq., and Thomas E. Marshall, Esq., Jackson Lewis LLP, counsel for Defendants.

---

## INTRODUCTION

This matter is presently before the Court on a motion for summary judgment brought by Defendants Zayo Bandwidth Northeast, LLC, Onvoy, Inc., and Zayo Group Inc. (collectively, "Defendants") in this employment discharge action.[1]  For the reasons set forth below, the Court grants Defendants' motion in part and denies it in part.

---

[1]      Krutchen has identified "Zayo Group, Inc." as a defendant.  But while Defendants contend that "the correct name of the parent *corporation* is Zayo Group, *LLC*" (Doc. No. 57 at 2 n.1 (emphases added)), it thus remains unclear whether it is a limited liability *company* or a traditional *corporation*.  Insofar as Zayo Group's entity status is irrelevant for present purposes, the Court will refer to it simply as "Zayo Group."

Since late 2007, Plaintiff James C. Krutchen had been employed by Zayo

Bandwidth.  On January 3, 2008, Troi Kau, a supervisor with Zayo Bandwidth,

terminated Krutchen after Krutchen appeared at a Zayo Group work-site at the Northstar

building in downtown Minneapolis (the "Northstar facility").  Kau contends that

Krutchen disobeyed his instructions not to visit any of Defendants' Twin Cities facilities.

Krutchen claims his termination is merely pretext, however, for his having blown

the whistle several years earlier on certain improper if not illegal business actions of

Onvoy, the predecessor component of Zayo Group that had employed Krutchen at the

time.[2]  Krutchen argues that terminating him for visiting the Northstar facility is clearly

pretextual because he was told–at least according to his purported understanding–only to

not visit certain other sites, those that were operated by, and staffed with employees of,

the predecessor entity that had previously employed him, while the site he visited was an

unmanned site that was not a facility of that predecessor entity.

_____

[2]      Defendants perpetuate the confusion regarding Zayo Group by also
asserting that it "is the parent *corporation* of three wholly owned *subsidiary business
units*, Zayo Bandwidth, Zayo Enterprise Networks and Onvoy Voice Services."  (Doc.
No. 57 at 2 (emphases added).)  And they also extend the confusion to the entity status of
these "subsidiary business units."  Such confusion–whether they are in fact wholly-owned
subsidiary corporations, rather than merely unincorporated operating divisions or units, of
Zayo Group so as to be separate entities as a matter of law–is perhaps more relevant than
that regarding Zayo Group because one of the issues raised by the parties is whether Zayo
Group or Onvoy Voice Services could interfere with Krutchen's employment contract
with Zayo Bandwidth, an issue turning in part on whether the parties alleged to have
interfered with the contract are separate from the parties to the contract.  (*Compare* Doc.
No. 21 (Defendants' Joint Answer), ¶¶ 3-5 *with* Doc. No. 58, Ex. 7 (Depo. of John L.
Scarano) at 36-44.)  In any event, the Court will refer to the entity that Krutchen has
named as Defendant "Onvoy, Inc." as "Onvoy Voice Services" in order to differentiate it
from the former "Onvoy, Inc." that was acquired by what became Zayo Group and then
folded into Zayo Group's present business operations.

## FACTUAL AND PROCEDURAL BACKGROUND

Krutchen is an engineer who works in the telecommunications field.[3] In July 1998, Krutchen began working in Minnesota for MEANS Telecom, which became Onvoy in April 1999. While Krutchen was employed by Onvoy, he claims he became aware of a scheme, called "Canadian Gateway," by which Onvoy routed telephone traffic for MCI Communications Corporation to avoid the payment of access charges. The purpose of this scheme was to deceive AT&T into handling MCI-originated long distance traffic and for AT&T to pay the terminating access charges for MCI's calls.

Concerned that these projects were not lawful, Krutchen voiced his concerns to Onvoy's upper management. In October 2002, Krutchen claims he informed Onvoy's Chief Operating Officer Fritz Hendricks about the Canadian Gateway project, specifically alleging that MCI was cheating AT&T. In January 2003, Krutchen also notified Onvoy's General Counsel that he was concerned about this scheme.

Krutchen was laid off from Onvoy in January 2003 in connection with downsizing. Later that year, after relaying his concerns about the scheme to various authorities, Krutchen eventually informed federal law enforcement officers and provided a sworn statement to a grand jury that was convened to investigate the matter. When Onvoy learned of Krutchen's allegations, it denounced him at a press conference.

---

[3] The Court has recounted the underlying facts in greater detail in its Order of December 4, 2008, addressing Defendants' motion to dismiss, and it will repeat them only as relevant here.

In August 2003, Krutchen was hired by PPL Telecom and he relocated to Pennsylvania. In early 2007, Krutchen learned that PPL Telecom was to be sold. Krutchen was told that he was critical to the success of the transition, and PPL Telecom agreed in writing to provide him with severance benefits of nine months of pay if he continued working for PPL Telecom and was fired without cause by PPL Telecom or was not offered a position with PPL Telecom's successor. In May 2007, Communication Infrastructure Investments, LLC ("CII") announced it would purchase PPL Telecom.

As a result of this acquisition, PPL Telecom began operating under the name Zayo Bandwidth and Zayo Bandwidth became the wholly-owned subsidiary of CII. Krutchen's employment with PPL Telecom officially terminated on August 24, 2007, such that on August 25, 2007 he became an employee of Zayo Bandwidth. Zayo Bandwidth's offer of employment to Krutchen included its agreement to provide Krutchen with severance benefits equivalent to those he had been offered by PPL Telecom if he was terminated involuntarily–other than for cause–within twelve months after the acquisition closed.

Two days before the CII purchase of PPL Telecom and its transition to Zayo Bandwidth, Zayo Bandwidth announced it intended to purchase Onvoy, Krutchen's former employer, such that he likely would be working for the same management personnel who had denounced him after he disclosed Onvoy's activities to the authorities in 2003. Krutchen contacted Zayo Bandwidth's CEO, Dan Caruso, and Zayo Bandwidth's General Counsel to express his reservations.

CII purchased Onvoy on November 8, 2007. Around the same time, CII formed Zayo Group, which is an umbrella entity that operates three subsidiary businesses: Zayo Bandwidth, Onvoy Voice Services, and Zayo Managed Services. Krutchen alleges that there was no clear documentation regarding how Onvoy's personnel, responsibilities, or properties were to be split across the three companies. Also in November 2007, Krutchen notified his supervisor Troy Kau about his 2003 whistleblowing activities and the fact that he had been a witness in the federal criminal investigation of Onvoy.

In connection with the purchase of Onvoy and the resulting new corporate structure, several executives that had been at Onvoy prior to the purchase, and who were aware of Krutchen's activities or involved in the scheme he reported, were in positions of authority within the new structure. Hendricks, who had been Chief Operating Officer and Vice President at Onvoy prior to the merger, became the President of Onvoy Voice Services, and he reported to Caruso, who became President and Chief Executive Officer of Zayo Group. Moreover, Hendricks had participated in the press conference called to denounce Krutchen in 2003.

When the purchase of PPL Telecom was completed, Zayo Bandwidth instructed employees that it was "business as usual" and that existing responsibilities and projects should continue. Prior to the purchase, Krutchen had been working on a project with Eric Clelland from a firm named Cyan Optics to develop a telecommunications platform, and Krutchen understood that this project would continue given Zayo Bandwidth's directive.

In December 12, 2007, Krutchen, who lived and worked in Pennsylvania but who had scheduled a vacation in Minnesota to begin on December 22, 2007, advised Kau that he wished to attend a trial in Minneapolis of a product Cyan Optics was developing. The trial was scheduled to take place at Defendants' Northstar facility in Minneapolis on January 3, 2008. Although Kau was aware of the trip and had approved the vacation time, he told Krutchen by e-mail that the project was not a sufficiently high priority to warrant a business trip to Minnesota. Kau stated that Zayo Bandwidth "cannot afford to spend any extra resources on this" and that he "did not see a need for [Krutchen] to go out for a review" at that time. (Doc. No. 6, ¶ 42.) Krutchen alleges that Kau did not want him to attend the product test only because there was "way too much going on" for him to make a trip. (*Id.* ¶ 43.) On December 21, 2007, Kau and Krutchen spoke by telephone and Kau reiterated his prohibition to Krutchen, but the parties dispute the precise terms of what Kau told Krutchen.

On January 3, 2008, Krutchen accompanied Clelland to observe the test of Cyan Optics' equipment at the Northstar facility. Kau promptly learned of Krutchen's visit and called to inform him that his employment was terminated. That afternoon, Dan Nestico, the Manager of Engineering in Minnesota for Zayo Bandwidth, met with Krutchen to collect the company property in Krutchen's possession.

Krutchen then received a letter from Zayo Bandwidth's General Counsel dated January 11, 2008. Krutchen alleges the letter falsely stated that Kau had explained the reason for his termination on January 3, 2008, and that the reason was "'violation of

numerous Company policies, including but not limited to, insubordination.'" (*Id.* ¶ 51.) Zayo Bandwidth claimed that Krutchen "'blatant[ly] refused to follow instructions.'" (*Id.*) Zayo Bandwidth also claimed that Kau, orally and in writing, instructed Krutchen "'not to travel to Minnesota for business purposes and meet with the vendor Cyan.'" (*Id.*)

Krutchen then filed this action alleging wrongful termination. Krutchen's Amended Complaint originally asserted nine counts against Defendants. Defendants now move for summary judgment on all eight of the remaining claims, that is, for violation of Minnesota's Whistleblower statute, breach of contract, promissory estoppel, tortious interference with contract, unjust enrichment, defamation, violation of Pennsylvania's wage laws, and conspiracy under 42 U.S.C. § 1985.[4]

Despite the numerous theories of liability alleged, the relief Krutchen seeks can be distilled down to the following: (1) damages for retaliating against his whistle-blowing (under the state Whistleblower statute and federal civil rights law); (2) damages for defamation; (3) severance benefits (based on breach of contract, promissory estoppel, tortious interference with contract, unjust enrichment and Pennsylvania statutes); (4) a quarterly bonus (based on unjust enrichment and Pennsylvania statutes); and

---

[4] In their motion to dismiss, Defendants sought dismissal with respect to six of the nine counts alleged. Defendants did not then challenge Krutchen's claims for breach of contract, unjust enrichment, or violation of Pennsylvania wage laws. This Court dismissed only his Minnesota common law whistleblower claim. (Doc. No. 19.) It also denied Defendants' motion to transfer the action to Pennsylvania and struck without prejudice Plaintiff's claim for punitive damages, permitting him to reassert such a claim at a later date. (*Id.*)

(5) reimbursement of business expenses he incurred (based on unjust enrichment and Pennsylvania statutes).

## DISCUSSION

As discussed above, shortly after leaving the employment of Onvoy in January 2003, Krutchen informed the authorities about a telecommunications project that he believed was illegal, thereby incurring the wrath of his former employer. By force of circumstance, Krutchen became involved with Onvoy again when Krutchen's new employer was then acquired by a company that then also acquired Onvoy, such that Krutchen was once again working along with, if not directly for, personnel and managers of the company that he had accused of wrongdoing. Shortly thereafter, Krutchen's new employer terminated him–for cause (blatant insubordination) according to Defendants, but in retaliation for his whistle-blowing as alleged by Krutchen.

The viability of most of Krutchen's claims turn on whether he was validly discharged for cause. After a thorough review of the entire record, the Court concludes that Krutchen has not produced evidence that could support any conclusion that he was discharged in retaliation, rather than for cause. Although the fortuitous circumstances of Krutchen's employment history–his "re-employment," in effect, by the entity on which he had blown the whistle several years earlier–appear highly suggestive, they remain at bottom only that, as the Court sees no evidence that the nature of his termination in January 2008 was anything other than for cause, not a belated retaliation as Krutchen contends. No reasonable jury could agree, on the evidence Krutchen has produced, with

his purported understanding that he could visit certain select sites and thereby safely evade what he claims was Kau's prohibition only to avoid Onvoy facilities and personnel.

## I.     Summary Judgment Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the non-moving party. *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but must set forth specific facts

showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

Defendants now argue that they are entitled to summary judgment on all of Krutchen's remaining claims. Krutchen vigorously disputes Defendants' summation of the facts, contending that they "have glossed over or failed to mention" disputed issues of material fact, "failed to resolve all disputed facts in Krutchen's favor, or simply misrepresented the facts in an effort to support their ill-considered motion." (Doc. No. 63 at 15.) But because there are no genuine disputes of *material* fact, Defendants are entitled to judgment as a matter of law on all of Krutchen's claims, with one exception.

## II.  Krutchen Has Failed To Present Any Evidence of Pretext To Rebut Defendants' Showing That He Was Validly Terminated For Cause

Defendants have produced evidence showing that Krutchen was validly terminated for cause–blatant insubordination. Krutchen has failed to rebut that showing with any evidence that insubordination was a mere pretext for the retaliation he alleges. As Kau explains, he repeatedly turned down Krutchen's requests to visit certain facilities in Minnesota. He first rejected Krutchen's request to attend a December 2007 meeting with Infinera because there was no reason for Krutchen to travel to Minnesota and Kau was negotiating with Infinera and did not want Krutchen's presence jeopardizing those negotiations. (Doc. No. 58 (Aff. of T. Marshall), Ex. 2 (Depo. of Troi Kau) at 15.)

Krutchen complied with Kau's directions but another opportunity in Minnesota soon presented itself. Krutchen asked to attend a trial in Minneapolis that was scheduled for late December 2007 or early January 2008. Because Krutchen was going to be in

Minnesota on vacation over the Christmas and New Years holidays, there was no issue of Defendants having to incur any travel expenses. Rather, Kau told Krutchen not to go because Kau's understanding "was that Jim wanted to go to Minnesota and go to the places where Onvoy personnel were, and former Onvoy personnel as well as present Onvoy Voice Services personnel, to aggravate them." (*Id.* at 22.) Kau understood, based on Krutchen's prior disclosure that he had been a whistleblower with respect to Onvoy's involvement with the Canadian Gateway project, that Krutchen's "persistence to want to go to Minnesota when there was really no business reason to do that was kind of my primary indicator that, you know, he wants to force the issue." (*Id.* at 23.) Kau understood that Krutchen's departure from Onvoy had been acrimonious and that some of the former Onvoy management team were still employed in Minnesota. Accordingly, Kau was "concerned that it would be a problem for all parties concerned" if Krutchen returned to those facilities as it would "create a distraction that's unnecessary, counterproductive to work." (*Id.* at. 24.)

Kau, who was in Colorado, instructed Krutchen not to "do a site visit while in Minnesota." (*Id.* at 25.) And while Kau confirmed with Krutchen that he understood those instructions, Krutchen then "did it anyway." (*Id.*) Kau learned that Krutchen had accompanied [Clellan] to the Northstar site in downtown Minneapolis. As Kau testified, he then terminated Krutchen for insubordination–for going to the site despite having been directly told not to:

> I considered the fact that we had had three separate exchanges about that
> visit, and then him doing it anyway, to be cause for termination. His desire

> to go to Minnesota wasn't the cause. The fact that I told him not to, and he did it was the cause.

(*Id.* at 25; *accord id.* at 30 ("[H]e had gone ahead and gone to the site anyway, knowing that he understood my direction not to go."), & 32 ("Because I had told him not to do it, and he did it.").) Kau further testified that there was no "other reason for terminating [Krutchen] other than the fact . . . that he'd explicitly disobeyed a directive of [Kau's]." (*Id.* at 38.)

Krutchen contends that he has at least raised sufficient issues of material fact to defeat Defendants' motion for summary judgment. Krutchen highlights the facts that Kau told him not to attend the Northstar facility trial because Zayo "can't afford to spend any extra resources on" that project, which Krutchen claims he understood as simply a command that he "was not supposed to spend any money," not as a command that he was not "supposed to go to this trial." (Doc. No. 58, Ex. 1 (Depo. of James Krutchen) at 250.)

Krutchen's main opposition to Defendants' summary judgment motion, however, is based on a critical distinction he attempts to draw between Onvoy facilities–that is, facilities of the former Onvoy, Inc. for which Krutchen used to work–and what he terms "Zayo Bandwidth facilities"–that is, the other Minnesota facilities of Zayo Group that were not acquired from Onvoy. Krutchen testified that he was not prohibited from visiting non-Onvoy sites such as the Northstar facility, which he describes as a "Zayo Bandwidth facility," because he only "was uninvited from going to Onvoy facilities." (*Id.* at 252.) He thus claims he was "uninvited" only from attending a meeting in St. Louis Park regarding a Cyan presentation. Krutchen maintains that he was not told to not go to

the Northstar trial as Kau only told him "not to go to the Onvoy facility at St. Louis Park" because Kau did not want him "to interact with Onvoy employees." (*Id.* at 254.) As Krutchen claims he understood the conversation with Kau, Krutchen "was told not to meet with Onvoy employees at the Onvoy facility," such that it was permissible for him to attend the trial in downtown Minneapolis. (*Id.* at 256.) Krutchen thus adamantly maintains he was never told not to visit the Cyan trial site in Minneapolis.

This disagreement might at first appear to create a fact dispute that precludes summary judgment. But the record simply cannot support Krutchen's purported "understanding" that Kau's instructions were confined–or even could have been confined–to prohibiting Krutchen from visiting only those sites that had been Onvoy facilities before the acquisition or those sites where Krutchen might encounter former Onvoy personnel.

Granted, there may be a factual dispute as to the precise phrasing of Kau's oral instructions to Krutchen. And even if there is no dispute as to what was said, it is perhaps possible that Krutchen might yet have misunderstood what Kau meant. But even if there is a factual dispute as to Krutchen's precise understanding of Kau's instructions and prohibitions, any such dispute would not be material because the evidence only supports Kau's understanding that his directions to Krutchen clearly prohibited him broadly from visiting any Zayo Group site in Minnesota, including the Northstar facility. In short, whatever uncertainty might exist with respect to Krutchen's understanding of Kau's instructions does not present a factual dispute precluding summary judgment.

A broad-based prophylactic prohibition was not unwarranted in light of the fact that it was far from clear that any precise boundaries existed between what used to be an Onvoy facility before its acquisition by Zayo Group and what was now exclusively a Zayo Bandwidth facility. (Doc. No. 58, Ex. 4 (Depo. of Daniel A. Nestico) at 32-33 (explaining his understanding of "Onvoy facility" to extend broadly to the entire region of the former entity later acquired by Zayo).) John Scarano, the present COO of Zayo Group and President of Zayo Bandwidth, could not delineate clear dividing lines between the various operating units of Zayo Group or the physical facilities in which they operated in Minnesota. (*Id.*, Ex. 7 (Depo. of John L. Scarano) at 42; *see also id.* at 40 (explaining that while Zayo Group's rapid acquisition of various entities led to a complicated organizational chart, such boundaries were more legal formalities than meaningful distinctions).) After Zayo Group acquired Onvoy and reorganized it as Onvoy Voice Systems, the former facilities and operations of Onvoy were not neatly confined in terms of location or operation but rather permeated all of Zayo Group's operations in the Twin Cities. (*See id.* at 33 ("The lion's share of the business activities that Zayo [G]roup has in Minnesota are managed by [Onvoy Voice Systems].").)

As explained by Fritz Hendricks–formerly the Chief Operations Officer at Onvoy when Krutchen worked there in 2002 and presently the President of Onvoy Voice Services–all of Zayo Group's present facilities in the Twin Cities were formerly Onvoy facilities and after the acquisition the Northstar facility is a "shared facility" in that Onvoy

Voice Services has equipment or work space there along with the other Zayo Group entities. (Doc. No. 58, Ex. 5 (Depo. of Fritz Hendricks) at 45-47.)

Even Krutchen's Amended Complaint asserts that when CII formed Zayo Group in late 2007 following CII's acquisition of Onvoy, although there were "three subsidiary companies" under the "umbrella operating company" of Zayo Group, "[t]here was no clear documentation as to how the former Onvoy personnel, responsibilities, services, or properties were to be split across" Zayo Bandwidth, Onvoy Voice Services and Zayo Managed Services. (Doc. No. 6, ¶ 37.) And Krutchen now argues that "[i]n creating the three business units, the facilities, technology and employees of the two original entities were redistributed along functional lines," such that "some former Onvoy employees and facilities became employees of Zayo Bandwidth." (Doc. No. 63 at 7.) He further asserts that

> [m]any of Onvoy's facilities and personnel were moved into other groups based on function. Nestico himself moved from Onvoy to Zayo Bandwidth as a result of the merger. Therefore, the entire Zayo Group is a successor interest to Onvoy, just as it would be a successor interest to PPL Telecom.

(*Id.* at 21.)

Moreover, it is not unreasonable for Kau to have issued a broad-based prohibition that might appear to extend beyond what would be strictly necessary to preclude Krutchen from encountering former Onvoy personnel. Krutchen was in Minnesota only on vacation and there was no business necessity or assignment that would require his presence at any facility in Minnesota. Thus there was no need for any fine-tuned prohibition.

In short, any sort of precisely-tailored prohibition delineating easily-understood boundaries between "Onvoy facilities" and "Zayo Bandwidth facilities" was neither necessary nor likely even possible. Perhaps most importantly, any alleged understanding of Krutchen's to the contrary lacks any factual basis.

And Kau conferred with his superiors prior to terminating Krutchen. Everyone involved in that conference agreed that there was valid grounds for terminating Krutchen. Moreover, Sandra Mays, the head of Defendants' human resources department, testified that during that conference call all of the management personnel involved confirmed that Kau's instructions had been clear:

> Troy explained that he had told Jim on multiple occasions not to attend the site visit in Minnesota. And he had gone to attend the site visit irrespective of the direction he had been given. Michele asked clarifying questions to make sure that the communications had been clear.
> . . .
> She asked him, Are you sure that the direction was clear? Could there have been any misunderstanding? He supplied her with the e-mail that Troy had sent to him prior to the 21st and Troy walked her through the discussions he had had with him afterwards.

(Doc. No. 58, Ex. 6 (Depo. of Sandra Mays) at 38.)

While Krutchen's apparent misunderstanding of the scope of Kau's prohibition is perhaps unfortunate, the mistake hardly supports Krutchen's claims of retaliatory discharge. Kau understood his directions to Krutchen to prohibit him from attending any site in Minnesota, regardless of whether it was a former Onvoy site or whether Onvoy personnel would be present. Thus, even Krutchen's visit to the unmanned Northstar site would constitute insubordination. The existence of such a misunderstanding, however,

does not preclude summary judgment as it could not establish that the termination was in retaliation for Krutchen's having blown the whistle on Onvoy's involvement in the Project Gateway scheme.

In sum, there is no direct evidence of retaliation. And Krutchen's reliance on indirect evidence–the fortuitous circumstances of being re-employed by (or, more accurately, along with) the company that he had blown the whistle on several years earlier likewise offers no basis for Defendants' liability. While Krutchen claims his discharge was pretextual, the evidence cannot support his claimed understanding of his supervisor's direction that he should not visit only those facilities of his former employer. Rather, the evidence only supports the conclusion that the personnel and facilities of his former employer were now, after its acquisition by and merger into the overall operating structure of his new employer, integrated throughout the new company. Kau thus had cause to terminate Krutchen for insubordination by visiting the Northstar facility.

## III.    Termination For Cause Largely Precludes Any Recovery

Because Krutchen was validly terminated for insubordination, many of his claims fail as a matter of law.[5] His claim under the Minnesota Whistleblower statute as well as that under federal civil rights law are each premised on the allegation that Defendants

---

[5]    In its earlier Order addressing Defendants' motion to dismiss, the Court recited the elements and parameters of most of the causes of action on which Krutchen relies. (Doc. No. 19 (addressing Counts I, II, IV, V, VI and IX).) There is no need to repeat that analysis here and the Court will address only the decisive elements of the surviving claims. The claims that this Court did not discuss were those for breach of contract and unjust enrichment as well as that under Pennsylvania wage statutes (Counts III, VII and VIII).

terminated him in retaliation for his 2003 disclosures regarding the Canadian Gateway project. But because he was terminated for insubordination with respect to his actions in late 2007 and early 2008, both claims fail.

Likewise, his claims for breach of contract, promissory estoppel and tortious interference with contract all hinge on whether the agreement or promise to pay Krutchen severance benefits was conditioned on the fact that his termination would not be for cause. Again, the conclusion that he was validly terminated for insubordination thus precludes these three claims. The defamation claim also turns on whether he was terminated for cause, that is, whether certain statements to that effect were true.

Similarly, Krutchen's claim for unjust enrichment turns in substantial part on whether Defendants benefitted unfairly by not paying severance benefits and a bonus even though Krutchen was dismissed for insubordination. But one aspect of that claim, that is, the request for reimbursement of business expenses that Krutchen validly incurred on behalf of his employment, is independent of the basis for his termination.[6]

### A.    Statutory Retaliation Claims

Two of Krutchen's claims allege that Defendants are liable for having retaliated against him for having disclosed the allegedly improper actions of Onvoy before it was acquired by Defendants. Count I is premised on Minnesota's so-called "Whistleblower"

---

[6]    Finally, his claim under Pennsylvania wage statutes provides no additional or different substantive basis to recover damages, being only a procedural mechanism for recovery of "wages" to which an employee is otherwise entitled.

statute, Minn. Stat. § 181.932, and Count IX is based on a federal civil rights statute, 42 U.S.C. § 1985.

### 1. Minnesota's Whistleblower Statute

The Minnesota Whistleblower Act limits the general rule of at-will employment by prohibiting an employer from taking adverse action against an employee on account of the employee having reported, in good faith, "a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official." Minn. Stat. § 181.932. Such claims are analyzed under the *McDonnell Douglas* burden-shifting test. *Cokley v. City of Otsego,* 623 N.W.2d 625, 630 (Minn. App. 2001); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569 (Minn. 1987). Under this test, the employee must first establish a prima facie case of retaliatory discharge by showing: (1) statutorily protected conduct; (2) adverse employment action; and (3) a causal nexus between the two. *Cokley,* 623 N.W.2d at 630. If the employee can establish a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for its action. *Id.* If the employer meets its burden of production, the employee must demonstrate that the employer's articulated justification is pretextual. *Id.* At all times the employee has the burden to prove that the employer's action was taken for an impermissible reason. *Phipps,* 408 N.W.2d at 572.

Here, even if Krutchen engaged in protected conduct and suffered the adverse employment action of termination, he cannot show any causal connection between those

events or that Defendants' reason for termination was merely pretextual. Krutchen's insubordination in not following his supervisor's instructions constitutes cause for discharge and there is no evidence that Defendants took advantage of the situation as a pretext for retaliating against Krutchen for his whistle-blowing.

## 2. Civil Rights Conspiracy: 42 U.S.C. § 1985

Similarly, Krutchen alleges that Defendants violated 42 U.S.C. § 1985 by conspiring to injure him in retaliation for his having attended, and submitted testimony in, a federal grand jury proceeding regarding his whistle-blowing. (Doc. No. 6, ¶¶ 99-101.) Section 1985 provides a cause of action for damages to any person injured by a conspiracy to interfere with a person's civil rights by (among other things) retaliating against such a person for their having participated in court proceedings. 42 U.S.C. § 1985(2). The principal elements of conspiracy are "an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Gometz v. Culwell*, 850 F.2d 461, 464 (8th Cir. 1988) (citing *Mizokami Bros., Inc. v. Mobay Chem. Corp.,* 660 F.2d 712, 718 n.8 (8th Cir. 1981)). To survive a motion for summary judgment, a plaintiff must produce evidence of such a conspiracy by demonstrating "'with specific material facts' that the parties reached some agreement and conspired together to injure the plaintiff." *Id.*

Krutchen now asserts that Kau, along with Sandi Mays (the head of Zayo Group's human resources department), Scott Beer (Zayo Group's General Counsel), and John Scarano (the COO of Zayo Group and President of Zayo Bandwidth) "acted in concert to

trump up an allegation of insubordination and by agreeing to terminate Krutchen's employment." (Doc. No. 63 at 34.) He further asserts that "a jury could infer that they were retaliating against Krutchen [based on] Scarano's odd request that Hendricks, the President of a sister entity (and a former officer of Onvoy), collect Krutchen's company property." (*Id.*)

In its previous Order addressing Defendants motion to dismiss, this Court declined to dismiss Krutchen's claim under 42 U.S.C. § 1985 because his allegations "contain enough specificity to rise above speculation and involve sufficient facts to raise a reasonable expectation that evidence in support of the claim will be revealed through discovery." (Doc. No. 19 at 33.) But the Court expressly noted that "his allegations would be insufficient to survive summary judgment or to prevail at trial." (*Id.*)

Now, following discovery, Krutchen has identified no facts supporting his conspiracy claim. While asserting that a jury "could infer" such a conspiracy, Krutchen offers no plausible evidence of any agreement to retaliate against him for his whistle-blowing testimony. The fact that Kau met with his superiors to discuss the dismissal of Krutchen is perhaps concerted action by definition, but so is any benign business meeting. Absent any evidence that the dismissal was invalid–and here the Court has concluded that Defendants had cause to terminate Krutchen for insubordination–much less in retaliation for Krutchen's former testimony, the mere fact of such a meeting hardly substantiates a conspiracy for purposes of Section 1985. And the fact that Scarano asked a former officer of Onvoy to collect Krutchen's company property hardly bears the

inferential weight Krutchen attempts to place on any such fact, as that officer was now the head of Onvoy Voice Systems, the division or subsidiary of Zayo Group that managed "the lion's share of the business activities that Zayo [G]roup has in Minnesota." (Doc. No. 58, Ex. 7 (Depo. of John L. Scarano) at 33.) That Scarano would first turn to the head of the entity located where Krutchen was being terminated as opposed to, for example, the head of the entity located where Krutchen usually worked, is hardly indicative of any conspiracy to retaliate. In sum, there is no evidence supporting a valid claim either of retaliation under the state whistleblower statute or of conspiracy to retaliate under the federal civil rights statute.

### B. Breach of Contract and Related Claims

The Court turns next to Krutchen's contract and contract-related claims of promissory estoppel and tortious interference with contract, all of which seek the same relief, that is, payment of the severance benefits to which Krutchen claims he was entitled upon his termination.

### 1. Breach of Contract

With respect to Krutchen's claim for breach of contract, he alleges that Defendants breached the employment agreement by terminating him without cause and thus denied him the severance benefits due under the agreement to those terminated for reasons other than for cause. (Doc. No. 6, ¶¶ 65-68.) Defendants contend that no such benefits are due because Krutchen's insubordination constitutes cause. Krutchen concedes that terminated employees "are not entitled to benefits if they are terminated for 'cause.'" (Doc. No. 63

at 26.)  While Krutchen "disputes that he was insubordinate" (*id.*), this Court has concluded that there is no genuine factual issue as to whether he was fired for cause.

## 2.  Promissory Estoppel

Krutchen's claim under the doctrine of promissory estoppel concerns the same benefits at issue with respect to his breach of contract claim.  Because promissory estoppel is a creature of equity that implies "a contract in law where none exists in fact," *Grouse v. Group Health Plan, Inc.,* 306 N.W.2d 114, 116 (Minn. 1981), such a claim may not proceed where a legally enforceable contract was formed, *Gorham v. Benson Optical*, 539 N.W.2d 798, 801-802 (Minn. App. 1995).

Here, Defendants now admit a valid contract existed, and thus contend that any promissory estoppel claim is precluded.  The Court agrees.  And even if Krutchen and Defendants had not entered a valid contract regarding severance benefits but Defendants otherwise had promised to pay such benefits upon his involuntary termination, Defendants' obligation does not extend to any duty to pay such benefits where Krutchen's termination was for cause.  Promissory estoppel does not provide a means to evade the fact that the claimant failed to establish breach of the contract; rather, it provides an equitable basis for recovery of a promised benefit where the requirements for the formation of an enforceable contract cannot be met.  Krutchen's insubordination does not preclude the formation of a contract; it precludes any finding that Defendants breached the contract and thus also precludes any recovery under promissory estoppel.

## 3.  Tortious Interference With Contract

In his claim for tortious interference with contract, Krutchen contends that Zayo Group and Onvoy Voice Services interfered with his contract with Zayo Bandwidth for severance pay. (Doc. No. 6, ¶¶ 79-81.) A claim of tortious interference with contract requires, among other elements, that the alleged wrongdoer intentionally procured the breach of a valid contract. *Kjesbo v. Ricks,* 517 N.W.2d 585, 588 (Minn. 1994) (enumerating five elements). But here, there can be no claim that Zayo Group or Onvoy procured any such breach because that contract was not breached, Krutchen having been terminated for cause.

In sum, regardless of the legal theory of liability for any particular claim for the severance benefits, Krutchen cannot recover such benefits where they were conditioned on not being terminated for cause.

**C.    Defamation**

With respect to Krutchen's claim of defamation, he alleged that his supervisor, Kau, acting as an agent for Zayo Bandwidth, falsely advised others at Zayo Bandwidth and/or at Zayo Group that he instructed Krutchen not to attend the Cyan Optics product trial, that Krutchen defied the instruction, that Krutchen was insubordinate, and that Krutchen violated other policies of his employer. (Doc. No. 6, ¶ 86.)

The elements of defamation are: (1) a false and defamatory statement about the plaintiff; (2) publication of that statement to a third party; and (3) harm to the plaintiff's reputation. *Weinberger v. Maplewood Review,* 668 N.W.2d 667, 673 (Minn. 2003). Defamation that affects a plaintiff in his or her business, trade, or profession is

defamation per se and is actionable without proof of actual damages. *Stuempges v. Parke, Davis & Co*, 297 N.W.2d 252, 255 (Minn. 1980).

Defendants contend that Kau's statements are subject to a qualified privilege because they were made without malice and only to other managerial employees of the various business entities operating as and under Zayo Group.[7] They further assert that, in any event, all of those statements were in fact true.

In response, Krutchen now contends only that Defendants lacked a qualified privilege to make a defamatory statement, an argument that assumes the statement was indeed false. He claims that Kau "should have known and certainly could have discovered" that Krutchen was "not actually subordinate." (Doc. No. 63 at 31.) Krutchen relies on an attempted analogy with the facts of *Wirig v. Kinnery Shoe Corp.*, which ruled as a matter of law that the employer did not have a qualified privilege where its "managerial personnel who repeated the accusations simply believed their sources without further investigation." 461 N.W.2d 374, 380 (1990). But in *Wirig*, "no investigation occurred to substantiate the charges that [the plaintiff employee] had stolen

---

[7]     Kau did not publish his statements outside of a relatively confined circle of managerial personnel of the various entity Defendants. Because Kau was employed by Zayo Bandwidth and Krutchen alleges that Kau's statements were made solely in his capacity as an agent of his employer, the first question is whether Kau in fact "published" his statements to third parties. As this Court has noted, the record is not perfectly clear as to whether Zayo Bandwidth is a separate entity from Zayo Group or Onvoy Voice Systems. But even if all of the Defendants could be viewed as constituting a single entity, Kau's statements, if false, would constitute sufficient publication. *Frankson v. Design Space Int'l*, 394 N.W.2d 140, 144 (Minn. 1986). But any such conclusion does not preclude summary judgment here because the Court concludes that none of the statements were false.

merchandise." *Id.* Here, unlike the situation addressed in *Wirig*, where the employer took "no steps to investigate but relie[d] entirely on accusations either made by employees who may be biased or on second-hand hearsay with no identification of sources," Kau made the statements at issue based directly on his own personal knowledge of the directions and prohibitions he had issued to Krutchen. Kau simply informed the other managerial personnel that Krutchen disobeyed Kau's instructions. Thus, even assuming the statements were false, the court cannot hold that Defendants lacked a qualified privilege as a matter of law.

And in any event, the truth of a statement is, of course, an absolute defense to a defamation claim. *Stuempges*, 297 N.W.2d at 255. This Court's conclusion that Krutchen was terminated for cause–that he in fact visited a work site contrary to his supervisor's direct instruction–also compels the conclusion that any statements by Kau that Krutchen was insubordinate in doing so cannot be false.[8]

---

[8] Krutchen's additional argument, that "Kau relied entirely on hearsay and speculation in deciding that Krutchen should be kept away from Onvoy employees and had no real business justification for issuing such an order" warrants little discussion as it confuses an employer's obligation to investigate others' accusations with an employer's basis for directions to its employees. The basis for Kau's instructions to Krutchen to not visit worksites in the Twin Cities–be it hearsay and speculation–is not subject to the law of defamation and qualified privilege regarding how an employer should proceed in evaluating accusations of an employee's misconduct. That Kau lacked direct personal knowledge of whatever threat Krutchen might have posed in contacting Onvoy employees is irrelevant to the defamation analysis. Whatever the basis for Kau's instructions–even perhaps if he lacked any "real business justification" for telling Krutchen to stay away from such sites–once Kau issued such instructions and Krutchen violated them, Kau was entitled to relate the fact of his own instructions and Krutchen's insubordination in disobeying them to the relevant managerial personnel in order to confirm that termination was warranted and appropriate.

### D.  Unjust Enrichment

In his Amended Complaint, Krutchen alleges that Zayo Bandwidth was unjustly enriched by its failure to reimburse Krutchen for legitimate business expenses, failure to pay him the bonus due and owing to him, and failure to pay him the severance payment due and owing to him.  (Doc. No. 6, ¶ 92.)  Unjust enrichment provides an equitable remedy where another party has knowingly received something of value to which it is not entitled under circumstances that would make it unjust to permit its retention.  *Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc.*, 493 N.W.2d 137, 140 (Minn. App. 1992).

Defendants did not challenge this particular claim in their motion to dismiss, but now claim that it, like the claim for promissory estoppel, must fail because, as an equitable remedy, it may proceed only where no adequate remedy at law exists.  They further contend that Krutchen has not provided the requisite receipts to obtain reimbursement for expenses, that he is not entitled to any bonus under the terms of the bonus plan, and that he has no equitable basis for recovering the severance benefits he claims.

Krutchen offers only the generic and factually-unspecified response that Defendants were unjustly enriched "[b]ased on the facts discussed above."  (Doc. No. 63 at 31.)  Such a response does not meet the applicable standard governing a party's obligations in opposing a properly-supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986) (stating that non-movant "must set forth specific facts showing that there is a genuine issue for trial").

In any event, discharge for cause would preclude any entitlement to the severance payment Krutchen claims under an unjust enrichment theory the same as it does under his breach of contract or promissory estoppel theories. There is nothing unjust in not paying an employee severance benefits under an agreement that provided certain conditions–including not being terminated for cause–that were not met.

With respect to the bonus Krutchen claims he was entitled to, there likewise is no evidence that Krutchen satisfied the condition that he be employed when the bonus is paid. As Defendants contend, the applicable bonus policy requires that the employee "[m]ust be employed at the time [the] bonus is paid." (Doc. No. 58, Ex. 10.) Krutchen responds only by claiming that he "was employed through January 3, 2008," thereby purportedly entitling him to the bonus for the fourth quarter of 2007. (Doc. No. 63 at 33.) But Krutchen offers no evidence as to when the bonus for that quarter was paid.

With respect to the alleged failure to reimburse Krutchen for his business expenses, however, if Krutchen incurred expenses while performing his employment duties and his employer then failed to reimburse him for such work-related expenses, his employer may have been unjustly enriched, although perhaps in a somewhat converse fashion compared to the usual scenario of a claimant having conferred a positive benefit upon another. In the present context, the employee would have incurred expenses that the employer should have born.

Here, the present record supports Krutchen's claim that he submitted the original receipts but that they were never received. (Doc. No. 58, Ex. 1 (Krutchen Depo.), Depo.

Ex. 73.) Defendants seem to have confirmed as much when they requested re-submission so that they could process Krutchen's request. (*Id.*) Thus, Defendants are not entitled to summary judgment on his claim for unreimbursed business expenses.

### E.    Pennsylvania Wage Statutes

Relying on Pennsylvania employment statutes, Krutchen also seeks the same relief he requests on his unjust enrichment claim, that is, to recover the severance pay and quarterly bonus to which he claims he is entitled, and his allegedly unreimbursed business expenses. And as Krutchen himself points out, Pennsylvania's wage statutes do not create any independent substantial right to employment compensation, but rather only provide an enforcement mechanism for payment of wages and compensation to which the employee was otherwise entitled. *Hartman v. Baker*, 766 A.2d 347, 352 (Pa. Sup. Ct. 2000); *Weldon v. Kraft, Inc.*, 896 F.2d 793, 801 (3d Cir. 1990).

Because the Pennsylvania statutes at issue provide only a mechanism to enforce otherwise existing rights, there is no need for any additional or different analysis of Krutchen's various claims for relief. In short, Krutchen's termination for cause undermines his claim for any severance pay and he failed to satisfy a condition for receiving the quarterly bonus, but his claim for unreimbursed expenses may proceed.

### CONCLUSION

Because Krutchen has produced no evidence that his termination was in retaliation for his whistle-blowing to counter Defendants' showing of insubordination, most of his claims–those seeking (1) damages for retaliation (under state and federal statutes) and for

defamation, (2) a severance payment (under various common law theories), and (3) a quarterly bonus–fail as a matter of law. His claim for unreimbursed business expenses, however, is not precluded by his termination for cause.

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' motion for summary judgment (Doc. No. 55) is **GRANTED IN PART** (insofar as it seeks judgment on Counts I, III, IV, V, VI, IX and those portions of Counts VII & VIII seeking severance benefits and a quarterly bonus) and **DENIED IN PART** (insofar as it seeks judgment on those portions of Counts VII & VIII seeking unreimbursed business expenses).

2.     Counts I, III, IV, V, VI and IX, as well as those portions of Counts VII and VIII seeking severance benefits and the quarterly bonus are **DISMISSED WITH PREJUDICE**.


Dated:  March 1, 2010                                   s/Donovan W. Frank
                                                                    DONOVAN W. FRANK
                                                                    United States District Judge